UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| **Jerry Rodriguez** and **Isabella Irene Rodriguez**,<br><br>Plaintiffs,<br><br>v.<br><br>**Remy Coeytaux**,<br><br>Defendant. | Case No. 3:26-cv-00207 |

# PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS


Table of contents ..... i

Table of authorities ..... iii

I. The plaintiffs have alleged Article III standing ..... 1

A. Mr. Rodriguez has alleged that the death of his unborn child is fairly traceable to Coeytaux's allegedly unlawful conduct ..... 1

B. Ms. Rodriguez has alleged Article III standing for her qui tam relator claim ..... 5

1. A state has standing to sue those who violate or intend to violate its laws ..... 6

a. The complaint alleges that Coeytaux has violated HB 7 in the past ..... 6

b. The complaint alleges that Coeytaux intends to violate HB 7 in the future ..... 7

2. Ms. Rodriguez has standing to sue as a qui tam relator ..... 9

a. The Constitution allows Texas to assign HB 7 claims in their totality, and the assignees of these claims may establish Article III standing by relying on Texas's injuries ..... 10

b. The Constitution allows Texas to assign claims for monetary penalties and injunctive relief, and the assignees of these claims may establish Article III standing by relying on Texas's injuries ..... 20

C. The plaintiffs have alleged Article III standing to seek an anti-clawback injunction ..... 23

II. Mr. Rodriguez has alleged a claim for wrongful death ..... 26

A. Mr. Rodriguez has alleged that Coeytaux proximately caused the death of his unborn child ..... 26

1. Coeytaux cannot defeat but-for causation by arguing that Kendal Garza would have aborted even if Coeytaux had not supplied the drugs ..... 26

2. Coeytaux cannot defeat substantial-factor causation by blaming Adam and Kendal Garza for the abortion ..... 28

B. Mr. Rodriguez has alleged that Coeytaux committed a "wrongful act" under section 71.002(b) of the Texas Civil Practice and Remedies Code ........ 29

1. The facts alleged in the complaint show that Coeytaux mailed abortion drugs into Texas in violation of state and federal law ........ 30

2. The alleged violations of state and federal criminal statutes qualify as "wrongful" acts under section 71.002(b) ........ 32

III. Ms. Rodriguez has alleged a claim for relief under HB 7 ........ 34

A. Ms. Rodriguez is not acting "in concert or participation" with Mr. Rodriguez ........ 34

B. Ms. Rodriguez's factual allegations are neither vague nor conclusory, and detailed factual allegations are not required ........ 35

C. Qui tam statutes comport with the Texas Constitution ........ 36

D. HB 7 does not violate the Supreme Court's dormant commerce clause doctrine ........ 37

IV. The plaintiffs have alleged a claim for an anti-clawback injunction ........ 39

Conclusion ........ 40

Certificate of service ........ 41

## TABLE OF AUTHORITIES

### Cases

*American Tax Funding, LLC v. City of Syracuse*,
41 F. Supp. 3d 188 (N.D.N.Y. 2014) .......... 14

*Andrade v. Venable*, 372 S.W.3d 134 (Tex. 2012) .......... 36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 7, 8, 36

*Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*,
339 U.S. 827 (1950) .......... 12

*Babbitt v. United Farm Workers National Union*,
442 U.S. 289 (1979) .......... 23, 24, 25

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 7, 8, 35

*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 2

*Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332 (Tex. 2014) .......... 26

*Burt v. Playtika, Ltd.*, 132 F.4th 398 (6th Cir. 2025) .......... 15, 19, 21

*Bustamante v. Ponte*, 529 S.W.3d 447 (Tex. 2017) .......... 26

*California v. Texas*, 593 U.S. 659 (2021) .......... 1

*Christopher v. Harbury*, 536 U.S. 403 (2002) .......... 6, 7, 8, 30, 35

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) .......... 8

*Coker v. Wal-Mart Stores, Inc.*,
642 So. 2d 774 (Fla. Dist. Ct. App. 1994) .......... 29

*Community for Creative Non-Violence v. Pierce*,
814 F.2d 663 (D.C. Cir. 1987) .......... 2

*Consumer Federation of America v. FCC*,
348 F.3d 1009 (D.C. Cir. 2003) .......... 3

*Department of Commerce v. New York*, 588 U.S. 752 (2019) .......... 3, 4

*Doe v. Bolton*, 410 U.S. 179 (1973) .......... 24

*Dowden v. State*, 758 S.W.2d 264 (Tex. Crim. App. 1988) .......... 4

*Engelhardt v. Rogers Group, Inc.*,
132 F. Supp. 2d 757 (E.D. Ark. 2001) .......... 27

*Ex parte Young*, 209 U.S. 123 (1908) .......... 23

*First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. 174 (2026) .......... 23

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) .......... 39

*Grossman v. Wolfe*,
578 S.W.3d 250 (Tex. App.—Austin 2019, pet. denied) .......... 36

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .......... 29

*Hubbard v. Tod*, 171 U.S. 474 (1898) .......... 12

*In re Swinton*, 287 B.R. 634 (W.D. Pa. 2003) .......... 14

*In re Xerox Corp.*, 555 S.W.3d 518 (Tex. 2018) .......... 37

*Japan Whaling Ass'n v. American Cetacean Society*,
478 U.S. 221 (1986) .......... 3

*Lee v. Verizon Communications, Inc.*, 837 F.3d 523 (5th Cir. 2016) .......... 11, 17, 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 2, 5

*Little v. Shell Exploration & Production Co.*,
690 F.3d 282 (5th Cir. 2012) .......... 11, 17, 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 4, 22, 36

*Magadia v. Wal-Mart Associates, Inc.*,
999 F.3d 668 (9th Cir. 2021) .......... 15, 16, 17, 18, 21

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .......... 2

*McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004) .......... 32

*Mendia v. Garcia*, 768 F.3d 1009 (9th Cir. 2014) .......... 2

*Murthy v. Missouri*, 603 U.S. 43 (2024) .......... 9

*Nelson v. George,* 399 U.S. 224 (1970) .......... 38

*Nixon v. Mr. Property Management Co.*,
690 S.W.2d 546 (Tex. 1985) .......... 28

*Parsons v. U.S. Department of Justice*,
801 F.3d 701 (6th Cir. 2015) .......... 2

*Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998) .......... 33

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464 (1962) ................ 12
*Pollice v. National Tax Funding, L.P.*, 225 F.3d 379 (3d Cir. 2000) ................ 13
*Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233 (4th Cir. 1997) ........................ 29
*Rubin v. Johnson*, 550 N.E.2d 324 (Ind. Ct. App. 1990) ................................ 29
*Scott v. Board of Adjustment*, 405 S.W.2d 55 (Tex. 1966) ............................... 36
*Spence v. Fenchler*, 180 S.W. 597 (Tex. 1915) ................................................. 36
*Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008) ..................................................5, 9, 11, 12, 13, 17, 19
*State ex rel. White v. Griffin*, 604 F. Supp. 3d 1143 (D.N.M. 2022) ..........................................15, 18, 22
*Stauffer v. Brooks Brothers, Inc.*, 619 F.3d 1321 (Fed. Cir. 2010) .................... 21
*Stenberg v. Carhart*, 530 U.S. 914 (2000) ...................................................... 24
*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ............................................. 13
*Travis v. City of Mesquite*, 830 S.W.2d 94 (Tex. 1992) ............................ 26, 28
*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390 (4th Cir. 2013) ............................................................. 21, 22
*United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419 (2023) .............................................................................. 13
*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000) .............................5, 6, 9, 11, 13, 17, 19, 20, 21
*Virginia v. Hicks*, 539 U.S. 113 (2003) .......................................................... 39
*White v. Smith & Wesson Corp.*, 97 F. Supp. 2d 816 (N.D. Ohio 2000) ........................................................2
*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021) .................................. 25
*Windrum v. Kareh*, 581 S.W.3d 761 (Tex. 2019) ........................................... 33

**Statutes**

18 U.S.C. § 962 ................................................................................... 16
28 U.S.C. § 201 ................................................................................... 16
31 U.S.C. § 3729(a)(1) ....................................................................... 20, 22
31 U.S.C. § 3730(d)(1)–(2) ......................................................................20

35 U.S.C. § 292 .......... 16
46 U.S.C. § 80103(b) .......... 16
An Act to Prohibit the Carrying on the Slave Trade from the United States to any Foreign Place or Country (1794), Act of March 22, 1794, ch. 11, § 4, 1 Stat. 347 .......... 16
The First Census Act (1790), Act of Mar. 1, 1790, ch. 2, § 6, 1 Stat. 101 .......... 15
The First Copyright Act (1790), Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124 .......... 15
The Indian Commerce Act (1790), Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137 .......... 15
The Neutrality Act of 1794, Act of June 5, 1794, ch. 50, § 3, 1 Stat. 381 .......... 16
Tex. Civ. Prac. & Rem. Code § 71.002(b) .......... 26, 30, 33
Tex. Gov't Code § 311.032 .......... 39
Tex. Gov't Code § 311.036(a) .......... 32
Tex. Gov't Code § 2400.004 .......... 37
Tex. Health & Safety Code § 171A.101(b) .......... 10, 18
Tex. Health & Safety Code § 171A.101(d)(3)(B) .......... 35
Tex. Health & Safety Code § 171A.101(d)(3)(E) .......... 35
Tex. Health & Safety Code § 171A.151(a) .......... 40
Tex. Nat. Res. Code § 191.173(a) .......... 36
Tex. Penal Code § 7.03 .......... 31
Tex. Penal Code § 19.06 .......... 31
Tex. H.B. 7 § 4, 89th Leg., C.S. (2025) .......... 39
Tex. S.B. 8 § 2, 87th Leg., R.S. (2021) .......... 32

**Rules**

Fed. R. Civ. P. 65(d)(2)(C) .......... 35

**Other Authorities**

*Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207 (1989) .......... 13

Myriam E. Gilles, *Representational Standing: U.S. ex rel. Stevens and the Future of Public Law Litigation*, 89 Calif. L. Rev. 315 (2001) .......... 20

Hyman Gross, *A Theory Of Criminal Justice* (1979) .......... 27

John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989 (2008) .......... 23

H.L.A. Hart & Tony Honoré, *Causation in the Law* (1959) .......... 27

Eric A. Johnson, *Cause-in-Fact After Burrage v. United States*, 68 Fla. L. Rev. 1727 (2016) .......... 27

David J. Karp, *Causation in the Model Penal Code*, 78 Colum. L. Rev. 1249 (1978) .......... 27

Ken Paxton, *Updated Advisory on Texas Law Upon Reversal of Roe v. Wade* (July 27, 2022) .......... 32

Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521 (2005) .......... 20

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, comment c .......... 26

Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* (3d ed. 2008) .......... 3

Defendant Coeytaux argues that the plaintiffs failed to allege Article III standing or a claim on which relief may be granted. None of his arguments have merit.

## I. The Plaintiffs Have Alleged Article III Standing

Coeytaux contests the plaintiffs' Article III standing with respect to Mr. Rodriguez's wrongful-death claim, Ms. Rodriguez's HB 7 qui tam claim, and the plaintiffs' request for an anti-clawback injunction. We will discuss each of these in turn.

### A. Mr. Rodriguez Has Alleged That The Death Of His Unborn Child Is Fairly Traceable To Coeytaux's Allegedly Unlawful Conduct

To establish standing, Mr. Rodriguez needs to allege (and eventually show) that his injuries are "fairly traceable" to Coeytaux's allegedly unlawful conduct. *See California v. Texas*, 593 U.S. 659, 668–69 (2021) ("A plaintiff has standing only if he can allege personal injury fairly traceable to the defendant's allegedly unlawful conduct" (citation and internal quotation marks omitted)). Coeytaux does not contest the "injury in fact" or "redressability" components of the standing inquiry. He claims only that Mr. Rodriguez's injuries are not "fairly traceable" to his provision of the abortion-inducing drugs. According to Coeytaux, the involvement of Adam and Kendal Garza in the abortion makes the death attributable to the "independent actions" of "third parties not before the court,"[1] even though Coeytaux provided the drugs and mailed them to Texas with the intent of assisting an illegal abortion. Coeytaux further insists that he cannot be sued under Article III unless his provision of the drugs had a "determinative or coercive effect"[2] on the subsequent conduct of Adam and Kendal Garza.

---

1. Mot. to Dismiss, ECF No. 15, at 9.
2. Mot. to Dismiss, ECF No. 15, at 9–10 (quoting *TF-Harbor, LLC v. City of Rockwall*, 18 F. Supp. 3d 810, 820 (N.D. Tex. 2014)).

But the "fairly traceable" standard does not require Mr. Rodriguez to show proximate causation or even but-for causation between Coeytaux's actions and Kendal Garza's abortion. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing"); *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (traceability established when a defendant contributed to only an "incremental" part of the alleged injury); *Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987) (traceability established when a defendant's actions are "a substantial factor motivating the third parties' actions").

And traceability is not defeated when the plaintiff's harm is attributable to the intervening acts of a third party. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) ("This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."); *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) ("Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain."); *White v. Smith & Wesson Corp.*, 97 F. Supp. 2d 816, 825 (N.D. Ohio 2000) (harms caused by gun violence are "fairly traceable" to gun manufacturers, despite intervening acts of third-party criminals). Conduct that merely enables or facilitates a third party's injurious conduct is enough to satisfy the "fairly traceable" standard—even when a third party makes the ultimate decision to inflict the harm, and even if the harm would have occurred without the defendant's assistance. *See Parsons v. U.S. Department of Justice*, 801 F.3d 701, 714 (6th Cir. 2015) ("[T]he allegation that a defendant's conduct was a motivating factor in the third

party's injurious actions satisfies the requisite standard."); *Consumer Federation of America v. FCC*, 348 F.3d 10 09, 1012 (D.C. Cir. 2003) (traceability established when a defendant "permits a third-party to engage in conduct that allegedly injures a person").[3]

Coeytaux does not deny that his conduct aided and abetted Kendal Garza's abortion, and he does not deny that the abortion was the foreseeable and predictable effect of what she did. That dooms any attempt to defeat traceability by shifting the blame to Adam and Kendal Garza. A defendant who knowingly assists or inadvertently facilitates another's harmful conduct cannot deny traceability when that conduct is a predictable response to the defendant's actions. In *Department of Commerce v. New York*, 588 U.S. 752 (2019), for example, a coalition of states argued that they were injured by the Trump Administration's decision to add a citizenship question to the decennial census, which they claimed would deter noncitizens from responding and reduce the plaintiff states' representation in Congress. The Trump Administration denied traceability by blaming the states' injuries on the "independent action[s] of third parties choosing to violate their legal duty to respond to the census." *Id.* at 767. But the Supreme Court rejected this argument because those third-party choices were a "predictable" response to the Trump Administration's actions:

> [R]espondents have met their burden of showing that third parties will likely react in predictable ways to the citizenship question, even if they

3. *See also Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 230 n.4 (1986) (plaintiffs' injury was "fairly traceable" to federal government's failure to adequately regulate whaling, even though the injury stemmed from *Japan*'s whaling activity, which the plaintiffs alleged the federal government was required to restrain); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.5, at 311–15 (3d ed. 2008) ("It may be enough that the defendant's conduct is one among multiple causes.").

> do so unlawfully and despite the requirement that the Government keep individual answers confidential. The evidence at trial established that noncitizen households have historically responded to the census at lower rates than other groups, and the District Court did not clearly err in crediting the Census Bureau's theory that the discrepancy is likely attributable at least in part to noncitizens' reluctance to answer a citizenship question. Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties.

*Id.* at 768. Coeytaux cannot escape the holding of *Department of Commerce* because he does not (and cannot deny) that the resulting abortion was a "predictable" response to his actions. Indeed, the case for traceability is even stronger than in *Department of Commerce* because Coeytaux provided the drugs with the purpose and intent of facilitating a third party's decision to abort. The abortion was not merely a "predictable" result of Coeytaux's conduct, it was the *desired* result.

Coeytaux correctly observes that plaintiffs cannot establish standing when the alleged injuries were "the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). But the problem for Coeytaux is that Kendal Garza's abortion was not "independent" of Coeytaux's provision of the drugs. It was the direct result—and the *intended* result—of what Coeytaux did. Coeytaux's situation is no different from an accomplice or co-conspirator who provides a gun with the hope and expectation that a third party will use it to kill someone. That another person decided to pull the trigger does not absolve the person who furnished the gun from civil or criminal responsibility. *See Dowden v. State*, 758 S.W.2d 264, 273 (Tex. Crim. App. 1988) ("[W]hen the defendant intends to kill or intentionally commits acts that are likely to kill with a conscious disregard for life, he is guilty of murder even though he uses

another person to accomplish his objective." (citation and internal quotation marks omitted)). And it certainly does not defeat traceability under Article III, which is a less demanding standard than causation in tort and criminal law. *See Lexmark*, 572 U.S. at 134 n.6. Kendal Garza was the person who ingested the drugs, but her actions were enabled and facilitated by Coeytaux's conduct.

Coeytaux might be able to defeat traceability if Kendal Garza had decided to obtain a surgical abortion from an out-of-state provider with no connection to Coeytaux. In that situation, Kendal Garza's actions *would* be "independent" of Coeytaux, who would have done nothing to facilitate or aid or abet the abortion that actually occurred. But Coeytaux cannot defeat traceability when he provided the murder weapon that was ultimately used—and did so with the knowledge and expectation that someone else would use the drugs that he provided to kill an unborn child.

### B. Ms. Rodriguez Has Alleged Article III Standing For Her Qui Tam Relator Claim

Qui tam relator actions have been litigated in federal courts throughout this nation's history, and the Supreme Court has held that Article III allows the government to authorize qui tam suits by assigning its claims to private citizens. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773–74 (2000); *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 286 (2008) ("[A]n assignee can sue based on his assignor's injuries."). Coeytaux nonetheless argues that Ms. Rodriguez *lacks* standing to sue as an assignee because: (1) Texas would lack Article III standing to sue Coeytaux over his HB 7 violations; and (2) HB7 is an "improper qui tam statute" that cannot confer standing on assignees of the state's claims. *See* Mot. to Dismiss, ECF No. 15, at 11–20. Neither argument has merit.

### 1. A State Has Standing To Sue Those Who Violate Or Intend To Violate Its Laws

Coeytaux denies that Texas would have Article III standing to sue Coeytaux over his past or future violations of HB 7, and that Ms. Rodriguez therefore lacks standing to sue as an assignee of the state's claims. *See* Mot. to Dismiss, ECF No. 15, at 12 ("[W]hen the state itself cannot satisfy the injury-in-fact requirement of standing, qui tam litigants also lack standing."). But Coeytaux is wrong. The government always suffers Article III injury when an individual violates its laws. *See Vermont Agency*, 529 U.S. at 771 ("It is beyond doubt that the complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud."). And the civil penalties and injunctive relief authorized by HB 7 will redress the state's injuries by punishing Coeytaux for his past violations and restraining him from committing future illegal acts.

Coeytaux does not dispute these principles, and he does not (and cannot) deny that Texas would have standing to sue Coeytaux if he violated HB 7 in the past or has plans to violate HB 7 in the near future. Instead, Coeytaux claims that Ms. Rodriguez has failed to allege sufficient facts to show that Coeytaux has violated HB 7 and intends to continue violating the statute. *See* Mot. to Dismiss, ECF No. 15, at 11–15. But the allegations in the complaint are as clear as can be, and they must be accepted as true and construed in the light most favorable to the plaintiffs. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002) ("[O]n motion to dismiss, we accept Harbury's factual allegations and take them in the light most favorable to her.").

#### a. The Complaint Alleges That Coeytaux Has Violated HB 7 In The Past

With respect to Coeytaux's past violations, the complaint states:

> Coeytaux has mailed abortion pills into Texas many times since HB 7 took effect on December 4, 2025. Ms. Rodriguez is aware of at least two such occasions in which Coeytaux has mailed abortion pills into Texas in violation of HB 7 after the law took effect on December 4, 2025.

Complaint, ECF No. 1, at ¶ 34. Nothing more is needed to *allege* that Coeytaux has injured the state of Texas by mailing abortion pills in violation of HB 7. Coeytaux complains that the allegations are "conclusory and formulaic,"[4] but that is nonsense. These are factual allegations, not conclusions, and they must be assumed true on a motion to dismiss. *See Christopher*, 536 U.S. at 406 ("[W]e accept [the plaintiff's] factual allegations and take them in the light most favorable to her."). Coeytaux also describes Ms. Rodriguez's allegations as "bare bones," but detailed factual allegations are not required to survive a motion to dismiss, even after *Twombly* and *Iqbal*. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Rule 8 . . . does not require 'detailed factual allegations' " (citation omitted)).

#### b. The Complaint Alleges That Coeytaux Intends To Violate HB 7 In The Future

With respect to Coeytaux's intended future violations, the complaint notes that Coeytaux has violated HB 7 "many times" since it took effect and then states:

> Coeytaux intends to continue mailing abortion-inducing drugs into Texas in violation of HB 7 unless a federal court enjoins him from violating HB 7.

Complaint, ECF No. 1, at ¶ 34. These allegations must be assumed true, and they show that Texas will suffer future injury if Coeytaux is not enjoined.

---

4. Mot. to Dismiss, ECF No. 15, at 12.

Coeytaux denies that this alleges a "certainly impending" injury. *See* Mot. to Dismiss, ECF No. 15, at 13 (citing *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013)). He also denies that Ms. Rodriguez has alleged a "substantial risk" that Coeytaux will continue violating HB 7. *See id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).[5] Coeytaux is wrong on both counts. The complaint alleges that it is *certain*, not merely possible, that Coeytaux will continue mailing abortion-inducing pills into Texas absent judicial intervention, and it has buttressed this allegation of "certainly impending" future harm by noting that Coeytaux has violated HB 7 "many times" since it took effect on December 4, 2025. *See* Complaint, ECF No. 1, at ¶ 34. Those factual allegations must be assumed true on a motion to dismiss. *See Christopher*, 536 U.S. at 406. Coeytaux insists that the complaint must specify the future dates on which the violations will occur and the precise method by which he will violate the statute. *See* Mot. to Dismiss, ECF No. 15, at 13 ("[T]he complaint pleads no concrete facts showing when or how a violation will occur."); *see also id.* at 14 ("[T]here is no concrete plan alleged nor any factual support about 'when the some day' will supposedly be."). But it is absurd to require a plaintiff to plead those types of factual details before discovery has been taken, as Ms. Rodriguez does not have powers of divination or access to the requests for abortion pills that Coeytaux currently has in his possession. More importantly, the Supreme Court has held that "detailed factual allegations" of this sort are not required. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. It is enough for Ms. Rodriguez

5. The Supreme Court sometimes requires litigants seeking injunctive relief to allege (and eventually prove) and "certainly impending" future injury; other times it applies the less demanding "substantial risk" test. *See Clapper v. Amnesty International USA*, 568 U.S. 398, 414 n.5 (2013).

to allege that Coeytaux has violated HB 7 "many times," disclose the existence of two specific episodes in which Coeytaux mailed abortion-inducing drugs into Texas in violation of the statute, and assert that Coeytaux will continue this pattern of illegal activity until the courts put a stop to it. Coeytaux repeats his claim that Ms. Rodriguez's allegations are "conclusory,"[6] but these are *factual allegations*, not legal conclusions,[7] and they *must* be assumed true on a motion to dismiss.

Finally, Coeytaux observes that allegations of "past violations" will not by themselves confer standing to seek prospective relief. *See* Mot. to Dismiss, ECF No. 15, at 13 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983)). But Coeytaux's past violations of HB 7 can still serve as evidence that he intends to continue violating the statute, thereby defeating a *Twombly*/*Iqbal* challenge to the "plausibility" of the alleged future violations. *See Murthy v. Missouri*, 603 U.S. 43, 70 (2024) ("[P]ast harms . . . can serve as evidence of expected future harm."). And when Ms. Rodriguez combines these allegations of past violations with a claim that Coeytaux will persist in violating HB 7 until he is ordered to stop, she has alleged a "certainly impending" future injury to the state of Texas. *See* Complaint, ECF No. 1, at ¶ 34.

### 2. Ms. Rodriguez Has Standing To Sue As A Qui Tam Relator

The Supreme Court has held that governments may assign their claims to qui tam relators, and that relators may assert the government's injuries when they sue as assignees of the government's claims. *See Vermont Agency*, 529 U.S. at 773 ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor."); *Sprint*, 554 U.S. at 286 ("[A]n assignee can sue based on his assignor's injuries.").

6. Mot. to Dismiss, ECF No. 15, at 15.
7. *See* Mot. to Dismiss, ECF No. 15, at 14 (falsely describing Ms. Rodriguez's allegations of future harm as a "bare legal conclusion").

Yet Coeytaux *denies* that Ms. Rodriguez has standing to sue as an assignee of Texas's claims—even though Texas explicitly assigned its HB 7 claims to Ms. Rodriguez and other would-be qui tam relators. *See* Tex. Health & Safety Code § 171A.101(b) ("An action brought under this section must be brought in the name of the qui tam relator, *who is an assignee of this state's claim for relief*." (emphasis added)).

According to Coeytaux, the Constitution allows governments to make only "partial"[8] assignments to qui tam relators, and only when assigning claims for "compensatory damages"[9] to the government's fisc. Any other type of assignment is (according to Coeytaux) constitutionally forbidden—and constitutionally incapable of allowing the assignee to invoke state's injuries when suing in Article III courts. But there is nothing in the Constitution or in any binding precedent that forbids a government to assign claims in their totality or assign claims that seek civil penalties or injunctive relief. Nor is there is any basis in logic or reason to invent these constitutional limits on a government's authority to assign claims.

#### a. The Constitution Allows Texas To Assign HB 7 Claims In Their Totality, And The Assignees Of These Claims May Establish Article III Standing By Relying On Texas's Injuries

When *Vermont Agency* allowed uninjured qui tam relators to sue in federal court, it relied on the principle that assignees of claims have standing to assert the Article III injuries suffered by their assignors. The Court noted that assignments of claims (both partial and total) are commonplace, and that Article III courts had "routinely

8. Mot. to Dismiss, ECF No. 15, at 16.
9. Mot. to Dismiss, ECF No. 15, at 19.

entertained" suits brought by assignees who had suffered no harm of their own yet sued to vindicate the assignor's injuries:

> We believe, however, that adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor. The [False Claims Act] can reasonably be regarded as effecting a partial assignment of the Government's damages claim. Although we have never expressly recognized "representational standing" on the part of assignees, we have routinely entertained their suits—and also suits by subrogees, who have been described as "equitable assign[ees]." We conclude, therefore, that the United States' injury in fact suffices to confer standing on respondent Stevens.

*Vermont Agency*, 529 U.S. at 773–74 (citations and footnote omitted).

The Court recognized that the federal False Claims Act made only a "partial assignment" (and not a total assignment) of the government's claim to a qui tam relator. *See id.* at 773 & n.4. But the principle that *Vermont Agency* relied upon applies equally to partial and total assignments: The assignee of a claim may sue to vindicate injuries suffered by the assignor—even when the assignee has suffered no harm of his own, and even when the assignor has transferred the entirety rather than a portion of his claim. *See Vermont Agency*, 529 U.S. at 773 ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor."); *Sprint*, 554 U.S. at 286 ("[A]n assignee can sue based on his assignor's injuries."); *id.* at 275 (allowing litigant who had received a total assignment to rely on the assignor's injuries to establish Article III standing); *see also Little v. Shell Exploration & Production Co.*, 690 F.3d 282, 285 (5th Cir. 2012) ("[T]he Supreme Court fully embraced the concept that an 'assignee can sue based on his assignor's injuries.'" (quoting *Sprint*, 554 U.S. at 286)); *Lee v. Verizon Communications, Inc.*, 837 F.3d 523, 547 (5th Cir. 2016) ("In both *Sprint* and *Vermont Agency*, the Court found that the petitioners had standing

based on the history and precedent permitting assignees to maintain suit."). The cases that *Vermont Agency* cites to support its holding involved total assignments and not partial assignments of claims,[10] as did the Court's subsequent holding in *Sprint*.[11] So it is untenable to contend that assignees of claims cannot invoke *Vermont Agency* or use the assignor's injuries to establish Article III standing when they receive the assignor's claim in full.

We do not understand Coeytaux to be arguing that total assignments of claims are constitutionally impermissible. Instead, Coeytaux appears to be arguing that the Constitution prohibits only a *governmental entity* from making a total assignment of a claim to qui tam relators. *See* Mot. to Dismiss, ECF No. 15, at 16 ("An essential feature of qui tam actions is that the relevant statute must 'partially—not fully—assign the propriety remedy to the relator.'" (quoting *State ex rel. White v. Griffin*, 604 F. Supp. 3d 1143, 1148–49 (D.N.M. 2022)). But there is nothing in the U.S. Constitution that could prevent a state or local government from making a total assignment of that sort. Some believe that Article II prohibits the *federal* government from assigning claims to qui tam relators without subjecting their subsequent lawsuits to

10. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 465 (1962) ("The petitioner, Lou Poller, is the assignee of the Midwest Broadcasting Company, a dissolved corporation."); *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 829 (1950) ("This is a suit by respondent Hazeltine Research, Inc., as assignee of the licensor's interest in a nonexclusive patent license agreement . . ."); *Hubbard v. Tod*, 171 U.S. 474, 475 (1898) ("E.H. Hubbard, as assignee of the Union Loan & Trust Company, a corporation of Iowa, filed in said cause an intervening petition . . .").

11. *See Sprint*, 554 U.S. at 275.

executive-branch oversight and control,[12] but Article II has nothing to say about a *state* government's prerogatives to allocate powers between government officials and qui tam relators. *See Sweezy v. New Hampshire*, 354 U.S. 234, 255 (1957) ("[T]he concept of separation of powers embodied in the United States Constitution is not mandatory in state governments.").

The only possible constitutional provision that could limit Ms. Rodriguez's ability to sue as an assignee of the state's HB 7 claims is Article III, which would not prohibit the total assignment in 171A.101(b) but instead prevent Ms. Rodriguez from using the state's injuries to establish standing in federal court. But the Supreme Court has already held that assignees of claims may rely on the assignor's injuries to establish Article III standing—regardless of whether the assignee receives the entirety or only a portion of the assignor's claim. *See Vermont Agency*, 529 U.S. at 773 & n.4 (partial assignment); *Sprint*, 554 U.S. at 275 (total assignment). The Court's holdings in these cases are absolute: "[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Vermont Agency*, 529 U.S. at 773; *Sprint*, 554 U.S. at 286 (same). There is no carveout or caveat in these holdings for governmental entities that make total rather than partial assignments of their claims.

More importantly, governments often make total assignments of legal claims to private debt collectors—and federal courts not only uphold those assignments but allow the assignee to vindicate the assignor's injuries in the same manner as a partial assignee. *See Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 389 (3d Cir. 2000) ("[T]he government entities had the power to assign their rights relating to the tax,

12. *See United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 449–52 (2023) (Thomas, J., dissenting); *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207 (1989).

water and sewer claims and liens to NTF, and . . . NTF as assignee thereby stands in the shoes of the government entities with respect to these claims and liens."); *In re Swinton*, 287 B.R. 634, 638 (W.D. Pa. 2003) ("[A]n assignee of municipal liens, such as CARC, 'stands in the shoes' of the government entity and may collect the liens to the same extent as the municipality."); *American Tax Funding, LLC v. City of Syracuse*, 41 F. Supp. 3d 188, 191 (N.D.N.Y. 2014) ("ATF is a private company that specializes in purchasing liens from municipalities across the nation. It then seeks to collect on and profit from the outstanding liens."). No court (to our knowledge) has experienced constitutional angst when a governmental entity assigns the totality of a claim to a private collection agency. Nor has any court (to our knowledge) refused to apply *Vermont Agency* when a debt collector purchases the totality of a delinquent tax obligation and seeks to vindicate the assigned claim in federal court. Coeytaux provides no reason why total assignments to qui tam relators should be treated any differently in this regard. If the government can assign the entirety of a legal claim to a private debt collector, then it can make total assignments to qui tam relators as well. And each of these assignees can use the government's injuries to establish Article III standing under *Vermont Agency* and *Sprint*.

Finally, there is no basis in reason or logic to support the idea that: (1) Qui tam relators *may* invoke the state's injuries to establish Article III standing when they sue as "partial" assignees of the state's claim; but (2) Qui tam relators *may not* invoke the state's injuries to establish Article III standing when they sue as "total" assignees of the state's claim. If the assignee of a claim can establish standing by relying on the injuries of the assignor, as both *Vermont Agency* and *Sprint* hold, then it should make

no difference whether the assignee received the entirety or only a portion of the assignor's claim. If anything, a total assignee should have a stronger case for invoking the assignor's injuries in federal court, because a total assignment transfers the entirety of the claim (including the injuries that gave rise to the claim) to the assignee and allows him to proceed in court as though he were the original claim holder.

Coeytaux relies on the brute fact that one district court and two courts of appeals have asserted that qui tam relators may sue in federal court only when they received a partial rather than total assignment of a state's claim. *See State ex rel. White v. Griffin*, 604 F. Supp. 3d 1143, 1148–49 (D.N.M. 2022); *Magadia v. Wal-Mart Associates, Inc.*, 999 F.3d 668, 677 (9th Cir. 2021); *Burt v. Playtika, Ltd.*, 132 F.4th 398, 404–05 (6th Cir. 2025). None of these decisions are binding on this Court, and they cannot be followed unless this Court, in its independent judgment, finds them persuasive. The Court should disavow all of these opinions.

Let us start with *Magadia*, which insists that "a traditional *qui tam* action acts only as 'a *partial* assignment' of the Government's claim," in which "[t]he government remains the real party in interest throughout the litigation and 'may take complete control of the case if it wishes.'" *Magadia*, 999 F.3d at 677. But it is simply false for *Magadia* to assert that "traditional" qui tam statutes empowered the government to "take complete control" of any case that might be brought by a relator or informer. The numerous qui tam statutes enacted by the early Congresses[13]—and the qui tam

13. *See* The First Census Act (1790), Act of Mar. 1, 1790, ch. 2, § 6, 1 Stat. 101, 103; The First Copyright Act (1790), Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25; The Indian Commerce Act (1790), Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 137–138; An Act to Prohibit the Carrying on the Slave Trade from the United States to any Foreign Place or Country (1794), Act of March

statutes that remained on the books in contemporary times[14]—did not allow the government to "take control" of relator-initiated lawsuits. These statutes did require successful relators to share a portion of their recovery with the federal government, so they were "partial" assignments in that sense of the word,[15] but they gave relators autonomy in litigating their case and did not subject their lawsuits to government oversight or takeover.

*Magadia* correctly observes that the federal False Claims Act allows the federal government to "intervene in the [qui tam] litigation" and "settle over the objections of the relator," and that the False Claims Act requires federal-government consent "before the relator can have the case dismissed." *Id.* (citing 31 U.S.C. § 3730(b)–(f)). But the False Claims Act is only one of the countless number of qui tam statutes enacted throughout American history, and these features of the FCA are unique to that particular piece of qui tam legislation. All of the other qui tam statutes enacted by Congress have lacked provisions that empower the federal government to oversee or seize control of lawsuits brought by relators. Yet *Magadia* holds that a qui tam relator cannot assert Article III standing under *Vermont Agency* unless the qui tam

---

22, 1794, ch. 11, § 4, 1 Stat. 347, 349; The Neutrality Act of 1794, Act of June 5, 1794, ch. 50, § 3, 1 Stat. 381, 383 (attached as Exhibits 1–5).

14. *See, e.g.*, 28 U.S.C. § 201; 18 U.S.C. § 962; 46 U.S.C. § 80103(b); *see also* 35 U.S.C. § 292 (prior to amendment by Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 16, 125 Stat. 284, 329 (2011)) (attached as Exhibits 6–9).

15. *Magadia* falsely characterizes California's Private Attorney General Act (PAGA) as effectuating "a permanent, *full* assignment of California's interest to the aggrieved employee," even though it simultaneously acknowledges that PAGA requires private-party plaintiffs to "share a monetary judgment with the government." *Magadia*, 999 F.3d at 675, 677. A qui tam statute cannot make a "full" assignment of the government's claim when the government retains its right to a portion of the proceeds.

statute expressly authorizes the state to intervene in any action brought by the relator. *See id.* ("[T]he State has no authority under PAGA[16] to intervene in a case brought by an aggrieved employee. PAGA thus lacks the 'procedural controls' necessary to ensure that California—not the aggrieved employee (the named party in PAGA suits)—retains 'substantial authority' over the case." (citations omitted)). *Magadia* declares unconstitutional every qui tam statute that Congress has enacted apart from the False Claims Act, because all of these statutes (like PAGA) provide no explicit right for the federal government to intervene in ongoing qui tam litigation.[17]

*Magadia* acts as though the federal False Claims Act is the only qui tam statute that has ever existed, and that any qui tam regime that departs in the slightest way from the False Claims Act is not a "traditional" qui tam action and cannot confer standing through assignment.[18] But that is a non sequitur. It does not matter under Article III whether a qui tam relator is suing pursuant to a "traditional" qui tam statute, or whether the qui tam statute incorporates the "procedural controls" of the federal False Claims Act. All that matters is whether an assignment of the state's claim has occurred. *See Vermont Agency*, 529 U.S. at 773 ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor."); *Sprint*, 554 U.S. at 286 ("[A]n assignee can sue based on his assignor's injuries."); *Little*, 690 F.3d at

---

16. "PAGA" is an acronym for California's Private Attorney General Act. *See Magadia*, 999 F.3d at 672).

17. *See Magadia*, 999 F.3d at 675) ("A purported *qui tam* statute must hew closely to the traditional scope of a *qui tam* action for an uninjured plaintiff to maintain suit under Article III. So long as PAGA claims satisfy the traditional criteria for a *qui tam* action, Magadia may pursue his meal-break claim." (citations omitted)).

18. *See* statutes cited in notes 13–14 (attached as Exhibits 1–9).

285; *Lee*, 837 F.3d at 547. A debt collector who has been assigned the state's claim has the same standing to sue in federal court as the state itself would have had before the assignment—even though the assignment of the claim did not occur pursuant to a "traditional" qui tam statute, even though the state itself retains no authority to control or intervene in the debt collector's litigation. Ms. Rodriguez likewise has the same standing to pursue her HB 7 claims as the state of Texas would have had—not because of any similarities that may or may not exist between HB 7's qui tam regime and the federal False Claims Act, but from the mere fact that Ms. Rodriguez has been assigned the state's HB 7 claim. *See* Tex. Health & Safety Code § 171A.101(b) ("[T]he qui tam relator . . . is an assignee of this state's claim for relief.").

*Griffin* adopts and follows the rationale of *Magadia*, holding that *Vermont Agency* applies only when a qui tam statute allows the government to "'take complete control of the case if it wishes.'" *Griffin*, 604 F. Supp. 3d at 1149 (quoting *Magadia*, 999 F.3d at 677). Like *Magadia*, *Griffin* cites and discusses only the federal False Claims Act, while ignoring every other past and present qui tam statute. *See Griffin*, 604 F. Supp. 3d at 1149. And like *Magadia*, *Griffin* insists that qui tam statutes must include the features that appear in the federal False Claims Act,[19] even though these features are absent from every other congressional qui tam statute that has ever been enacted. *See* statutes cited in notes 13–14 (attached as Exhibits 1–9).

19. *See Griffin*, 604 F. Supp. 3d at 1149 (describing the federal False Claims Act as the "quintessential partial assignment statute" and noting that under the FCA, "the federal government may intervene in the litigation, can settle over the objections of the relator, and must give its consent before the relator can have the case dismissed." (citing 31 U.S.C. § 3730(b)–(f)); *id.* (faulting the New Mexico statute because "New Mexico retains no mechanism for controlling the litigation, intervening in the lawsuit, or objecting to a settlement or dismissal.")

Then there is *Burt*, which holds that qui tam relators may sue as assignees only when the qui tam statute: (1) "requires that the plaintiff share part of the recovery with the government"; and (2) "provides procedural safeguards to ensure that the government retains some control of the action." *See Burt*, 132 F.4th at 404–05. Yet *Burt* provides no reason for limiting an assignee's standing in this manner, and *Burt* makes no attempt to reconcile its stance with *Vermont Agency* and *Sprint*, which clearly and unequivocally hold that assignees have standing to assert an assignor's injuries in federal court. *See Vermont Agency*, 529 U.S. at 773 ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor."); *Sprint*, 554 U.S. at 286 ("[A]n assignee can sue based on his assignor's injuries."). *Burt* claims that "a qui tam statute" will "usually" require relators to share their recovery with the government and allow the government to control the conduct of the litigation. *See Burt*, 132 F.4th at 404. But so what? "Usually" is not "always,"[20] and a statute that assigns all of the state's claim is *still* an assignment of the state's claim. The existence of an assignment is all that is needed to allow a qui tam relator (or any other assignee) to assert the state's injury in federal court. *See Vermont Agency*, 529 U.S. at 773; *Sprint*, 554 U.S. at 286; *Little*, 690 F.3d at 285; *Lee*, 837 F.3d at 547.[21]

---

20. It is also demonstrably false for *Burt* to say that qui tam statutes "usually" require the government to "retain[] some control of the action." *See* pp. 15–17 *supra*; *see also* statutes cited in notes 13–14 (attached as Exhibits 1–9). It is true that qui tam statutes "usually" require the relator to share recovery with the government, but the Constitution does not revoke assignee standing whenever the government's assignment of a claim departs from its "usual" practice.

21. The law-review articles that Coeytaux cites are irrelevant because they argue that Article II and federal separation-of-powers principles should prevent *Congress* from making total assignments of HB 7-like claims to qui tam relators. *See* Myriam E. Gilles, *Representational Standing: U.S. ex rel. Stevens and the Future*

### b. The Constitution Allows Texas To Assign Claims For Monetary Penalties And Injunctive Relief, And The Assignees Of These Claims May Establish Article III Standing By Relying On Texas's Injuries

Coeytaux further argues that Article III allows qui tam relators to sue as assignees only when the government assigns them claims that vindicate a "proprietary" injury (such as an injury to the government's fisc), rather than a "sovereign" injury (which arises from the mere fact one of the government's laws has been or will be violated). *See* Mot. to Dismiss, ECF No. 15, at 16–17; id. at 19–20; *see also Vermont Agency*, 529 U.S. at 771 (acknowledging a distinction between a government's "proprietary" and "sovereign" injuries). On this view, a qui tam relator may sue in federal court if the state has assigned a claim for "compensatory damages," but not when the state has assigned a claim for "monetary penalties or injunctive relief." Mot. to Dismiss, ECF No. 15, at 16.

This argument is even more off base. The False Claims Act authorizes qui tam relators to seek recovery of treble damages plus "a civil penalty of not less than $5,000 and not more than $10,000" for each violation of the act. *See* 31 U.S.C. § 3729(a)(1). It also allows qui tam relators to keep a percentage of the total "proceeds of the action," which include not only the compensatory damages but also the trebled amount and the civil penalties that they recover. *See* 31 U.S.C. § 3730(d)(1)–(2). *Vermont Agency* upheld this arrangement under Article III while acknowledging

---

*of Public Law Litigation*, 89 Calif. L. Rev. 315, 341–48 (2001); Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521 (2005). Article II and federal separation-of-powers doctrines are inapplicable to state governments, and neither article discusses or considers whether Article III prevents the federal court from considering claims brought by qui tam relators who receive total assignments of a state government's claim.

that the False Claims Act authorized qui tam relators to vindicate both the "proprietary" and "sovereign" injuries that the government had suffered. *See Vermont Agency*, 529 U.S. at 771 ("[T]he complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud."); *see also United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 403 (4th Cir. 2013) ("Successful FCA relators can and do recover both damages and civil penalties."). Under Coeytaux's theory, *Vermont Agency* would have to be overruled at least in part, because it allows qui tam relators to seek recovery of both the "compensatory damages" and "monetary penalties" described in the False Claims Act.

Coeytaux cites no decision from any court that denies qui tam relators standing to pursue government-assigned claims for civil penalties or injunctive relief, and the court decisions that we have found have all rejected Coeytaux's attempt to distinguish "proprietary" from "sovereign" injuries when assessing the Article III standing of qui tam relators. *See Bunk*, 741 F.3d at 403 (rejecting the argument that "only the proprietary injury is an injury in fact for standing purposes"); *Stauffer v. Brooks Brothers, Inc.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("Stauffer's standing as the United States' assignee does not depend upon the alleged injury to the United States being proprietary, as opposed to sovereign.").[22] Early and modern qui tam statutes

22. *Magadia* and *Burt* have nothing to say about whether qui tam relators can sue to collect "monetary penalties" or vindicate a "sovereign" governmental injury. *See Magadia*, 999 F.3d at 677; *Burt*, 132 F.4th at 404–05. *Griffin* claims that "*Vermont Agency* did not recognize sovereign injury as a basis on which relators could establish an injury-in-fact. Instead, it held that the government's *proprie-*

alike have authorized relators and informers to collect fines and monetary penalties that vindicate sovereign injuries to the government, rather than compensatory damages that do no more than rectify injuries to the government's fisc. *See* statutes cited in notes 13–14 (attached as Exhibits 1–9). Yet Coeytaux entirely ignores these statutes—as well as the fact that the False Claims Act expressly authorizes qui tam relators to sue for "civil penalties" and treble damages. *See* 31 U.S.C. § 3729(a)(1). The Court should reject this argument out of hand.

* * *

Coeytaux expresses concern that allowing Texas to assign HB 7 claims to qui tam relators could allow Congress and state governments to weaken or circumvent *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), which purports to bar non-injured plaintiffs from suing in federal court even when a statute authorizes them to sue. *See* Mot. to Dismiss, ECF No. 15, at 17. But that ship sailed when *Vermont Agency* and *Sprint* allowed assignees to assert the injuries of their assignors in federal court. It may seem formalistic to distinguish the citizen-suit statute in *Lujan*, which merely "authorized" uninjured private citizens to sue lawbreakers in federal court, from statutes that "assign" the government's own claims against lawbreakers to qui tam relators and then authorize those uninjured relators to sue on the assigned claims. But the Supreme Court of the United States has endorsed this distinction, and whatever tension may exist between *Lujan* and *Vermont Agency* is no reason to deny Article III standing to an undisputed assignee of Texas's HB 7 claims.

---

*tary* interest was all that could be assigned to a *qui tam* relator to confer standing." *Griffin*, 604 F. Supp. 3d at 1147. That is patently false and misrepresents the *Vermont Agency* opinion. *See* pp. 20–22, *supra*; *Bunk*, 741 F.3d at 403–04.

### C. The Plaintiffs Have Alleged Article III Standing To Seek An Anti-Clawback Injunction

The plaintiffs are suffering Article III injury because they cannot pursue their claims against Coeytaux without exposing themselves to clawback lawsuits under California's shield law. Coeytaux acknowledges that California's shield law allows him to sue the plaintiffs for treble damages in response to the wrongful-death and HB 7 claims asserted in this lawsuit. Yet Coeytaux insists that the plaintiffs lack standing because Coeytaux has not yet issued an explicit threat to countersue the plaintiffs under California's shield law—even though Coeytaux can file this clawback lawsuit at any moment. As Coeytaux sees matters, the plaintiffs cannot have standing to seek an antisuit injunction until the clawback lawsuit that the plaintiffs fear becomes "certainly impending." *See* Mot. to Dismiss, ECF No. 15, at 20–21.

But the plaintiffs do not need to allege or prove that a clawback lawsuit is "certainly impending." The plaintiffs' Article III injury comes from the *threat* imposed by California's clawback statute, and that threat exists regardless of whether Coeytaux has imminent plans to countersue the plaintiffs under California's shield law. *See First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174, 192 (2026) ("[T]he value of a sword of Damocles is that it hangs—not that it drops." (citation omitted)). The test for Article III standing in this context is no different from when plaintiffs seek antisuit injunctions against state officials who are empowered to enforce allegedly unconstitutional statutes. *See, e.g.*, *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 302 (1979); *see also Ex parte Young*, 209 U.S. 123, 163 (1908) (recognizing "the right to enjoin an individual, even though a state official, from commencing suits"); John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 989 (2008) ("[*Ex parte*] *Young* was about a traditional tool of equity, the injunction to

restrain proceedings at law, or anti-suit injunction."). A plaintiff who seeks an anti-suit injunction under *Ex parte Young* need not wait until a state official explicitly threatens him with criminal prosecution or civil-enforcement action, and he need not wait until a prosecution or enforcement action becomes "certainly impending." *See Doe v. Bolton*, 410 U.S. 179, 188 (1973) (allowing abortion doctors to sue state officials charged with enforcing an abortion ban "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes."). Instead, a plaintiff needs only to show that: (1) His fears of prosecution or enforcement action are "not imaginary or wholly speculative"; and (2) The defendant that he seeks to enjoin "has not disavowed any intention of" enforcing the disputed statute against him:

> [W]hen fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). The consumer publicity provision on its face proscribes dishonest, untruthful, and deceptive publicity, and the criminal penalty provision applies in terms to "[a]ny person . . . who violates any provision" of the Act. Moreover, the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices. Appellees are thus not without some reason in fearing prosecution for violation of the ban on specified forms of consumer publicity. In our view, the positions of the parties are sufficiently adverse with respect to the consumer publicity provision proscribing misrepresentations to present a case or controversy within the jurisdiction of the District Court.

*Babbitt*, 442 U.S. at 302 (footnote omitted); *see also Stenberg v. Carhart*, 530 U.S. 914, 938–46 (2000) (allowing abortion providers to bring a pre-enforcement challenge to Nebraska's partial-birth abortion statute on the ground that it would prohibit the dilation and evacuation (D&E) procedure, despite the fact that the Attorney General

of Nebraska had specifically disclaimed any intention to enforce the statute against doctors who perform D&E abortions, because "some present prosecutors and future Attorneys General *may choose* to pursue physicians who use D & E procedures," subjecting those physicians to the "fear" of "potential prosecution, conviction, and imprisonment" (emphasis added)).

The plaintiffs have Article III standing because: (1) Their fear of being sued under California's clawback statute is "not imaginary or wholly speculative"; and (2) Coeytaux "has not disavowed any intention of" suing them under the clawback provision. *Babbitt*, 442 U.S. at 302. Coeytaux acknowledges that California's shield law empowers him to countersue the plaintiffs at any moment for treble damages. And the plaintiffs' fears of being hit with a clawback lawsuit are hardly "imaginary" or "wholly speculative" when the entire objective of California's clawback provision is to instill these fears into litigants who assert the type of claims that the plaintiffs are presenting in this litigation. In addition, Coeytaux has not unequivocally renounced the possibility of countersuing the plaintiffs under California's shield law. *Compare Whole Woman's Health v. Jackson*, 595 U.S. 30, 48 (2021) (plaintiffs lacked Article III standing to seek an antisuit injunction against Mark Lee Dickson because he "supplied sworn declarations" declaring that he "possesses no intention to file an S. B. 8 suit against them"). Coeytaux cannot perpetuate the *in terrorem* effects of California's shield law by reserving his right to file a clawback lawsuit against the plaintiffs, while simultaneously insisting that the plaintiffs lack Article III standing to pursue an antisuit injunction that would remove this threat.

## II. Mr. Rodriguez Has Alleged A Claim For Wrongful Death

Coeytaux denies that Mr. Rodriguez has alleged proximate causation or a "wrongful" act within the meaning of Tex. Civ. Prac. & Rem Code § 71.002(b). *See* Mot. to Dismiss, ECF No. 15, at 21–31. Each of these arguments is meritless.

### A. Mr. Rodriguez Has Alleged That Coeytaux Proximately Caused The Death Of His Unborn Child

Proximate causation requires "cause in fact" and "foreseeability." *See Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) ("The two elements of proximate cause are cause in fact and foreseeability."). "Cause in fact" requires the act or omission to serve as: (1) a but-for cause; and (2) a "substantial factor" in bringing about the injury. *See id.* The complaint sufficiently alleges each of these components.

#### 1. Coeytaux Cannot Defeat But-For Causation By Arguing That Kendal Garza Would Have Aborted Even If Coeytaux Had Not Supplied The Drugs

Coeytaux tries to defeat but-for causation by suggesting that Adam and Kendal Garza would have found some other way to kill Mr. Rodriguez's unborn child even if Coeytaux had never provided the abortion pills. *See* Mot. to Dismiss, ECF No. 15, at 23–23. But neither a tort defendant nor a criminal defendant can defeat causation by arguing that someone else would have inflicted the harm if the defendant had stayed on the sidelines. *See Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 344–46 (Tex. 2014); *Bustamante v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 27, comment c ("A defendant whose tortious act was fully capable of causing the plaintiff's harm should not escape liability merely because of the fortuity of another sufficient cause."); David J. Karp, *Causation in the Model Penal Code*, 78 Colum. L. Rev. 1249, 1286 n.100

(1978) ("If the recipient brings about his victim's death by shooting him, he cannot defend his action by showing that someone else would have shot the victim if he had not."); *Engelhardt v. Rogers Group, Inc.*, 132 F. Supp. 2d 757, 763 (E.D. Ark. 2001) ("This 'if I wasn't negligent then someone else would have been' argument is unpersuasive").

The plaintiffs need only to allege that Coeytaux's wrongful acts caused the death of Mr. Rodriguez's unborn child at the particular time and in the precise manner that it occurred. The complaint sufficiently alleges that Coeytaux's actions satisfy but-for causation in this sense, as Coeytaux supplied the actual drugs that were used in the murder and neither Adam nor Kendal Garza could have obtained or used those specific pills without Coeytaux's assistance. The plaintiffs do not need to allege or prove that the unborn child would have escaped abortion absent Coeytaux's involvement, and courts have uniformly rejected the "hypothetical alternative causation" defense that Coeytaux is asserting here. *See* pp. 26–27, *supra*. A hypothetical abortion provider who might have provided the fatal drugs if Coeytaux had not done so did not cause this allegedly wrongful death, and Coeytaux cannot defeat but-for causation by speculating about what others might have done in a counterfactual world. It is never a defense to show that someone else would have inflicted the complained-of harm if the defendant had not done so. *See* H.L.A. Hart & Tony Honoré, *Causation in the Law* 124–25, 249–50 (1959); Eric A. Johnson, *Cause-in-Fact After Burrage v. United States*, 68 Fla. L. Rev. 1727, 1761–62 (2016) ("No one seems to be inclined to relieve accomplices of liability on the ground that somebody else would have helped the principal if the actual accomplice had not."); Hyman Gross, *A Theory Of Criminal Justice* 243–44 (1979) ("We determine liability not according to what fate had in

store for the victim, but according to the conduct of the accused and the harm that it produced.”).

### 2. Coeytaux Cannot Defeat Substantial-Factor Causation By Blaming Adam And Kendal Garza For The Abortion

Coeytaux argues that Adam and Kendal Garza’s intervening acts prevent Coeytaux’s shipment of the pills from serving as a “substantial factor” in the death. *See* Mot. to Dismiss, ECF No. 15, at 27 (“Coeytaux’s involvement . . . merely created the condition for Mr. Garza’s and Mrs. Garza’s subsequent acts.”). But a third party’s intervening acts will not defeat proximate causation when those intervening acts were foreseeable—even when the intervening acts are criminal or negligent. *See Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) (“When the intervening illegal negligent act is foreseeable, it does not negate the continuing proximate causation and consequent liability of the initial actor.”); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549–50 (Tex. 1985) (“Usually, the criminal conduct of a third party is a superseding cause relieving the negligent actor from liability. However, the tortfeasor’s negligence will not be excused where the criminal conduct is a foreseeable result of such negligence.”).[23]

Adam Garza’s provision of the drugs and Kendal Garza’s abortion were the foreseeable results of Coeytaux’s conduct, as a person who traffics in abortion drugs would not only anticipate but expect that the drugs will eventually be used to kill an unborn child. *See Nixon*, 690 S.W.2d at 549–50 (“Foreseeability means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others.”); *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 251

23. Coeytaux’s provision of the abortion drugs to Adam Garza violated numerous criminal laws. *See* Complaint, ECF No. 1, at ¶¶ 18–30.

(4th Cir. 1997) (holding publisher of a hit-man manual liable for wrongful death, notwithstanding the subsequent intervening acts of the hit man, as the murder was the "natural consequence" of the publisher's actions); *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983) ("Under an aiding-abetting theory, [the wrongful death] was a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake."). A defendant who illegally supplies a murder weapon remains liable for wrongful death when the murder was a natural and foreseeable consequence of his assistance—and that remains the case regardless of any subsequent or intervening act taken by the person who received the illegally provided weapon. *See Rubin v. Johnson*, 550 N.E.2d 324, 331–33 (Ind. Ct. App. 1990) (allowing wrongful-death lawsuit to proceed against pawnshop that illegally sold a handgun to a mentally incompetent buyer in violation of Indiana law, and holding that the purchaser's "criminal use" of the illegally provided handgun "will not be deemed an intervening cause serving to eliminate Rubin's liability."); *Coker v. Wal-Mart Stores, Inc.*, 642 So. 2d 774, 778 (Fla. Dist. Ct. App. 1994) ("[W]e are unwilling to hold as a matter of law . . . that an ammunition vendor's violation of 18 U.S.C. § 922(b)(1) cannot be found to be the proximate cause of injury or death caused by the purchaser's intentional or criminal act."). Coeytaux's situation is no different: He provided abortion drugs to Adam Garza in violation of state and federal law, so he remains liable for any subsequent deaths that foreseeably resulted from his unlawful acts.

### B. Mr. Rodriguez Has Alleged That Coeytaux Committed A "Wrongful Act" Under Section 71.002(b) Of The Texas Civil Practice And Remedies Code

Section 71.002(b) imposes wrongful-death liability on any person who "causes" an individual's death by his "wrongful act, neglect, carelessness, unskillfulness, or

default." Tex. Civ. Prac. & Rem. Code § 71.002(b). The complaint alleges that Coeytaux committed a "wrongful" act by shipping abortion pills to Adam Garza in violation of numerous criminal statutes. *See* Complaint, ECF No. 1, at ¶¶ 18–28.

Coeytaux nonetheless denies that the complaint alleges a "wrongful act." He accuses the complaint of failing to allege facts showing that he violated the relevant criminal statutes. *See* Mot. to Dismiss, ECF No. 15, at 24–25. He also claims that violations of these state and federal criminal statutes do not qualify as "wrongful" acts under section 71.002(b). *See id.* at 25–31. Neither argument has merit.

### 1. The Facts Alleged In The Complaint Show That Coeytaux Mailed Abortion Drugs Into Texas In Violation Of State And Federal Law

The complaint alleges that Coeytaux "shipped the abortion-inducing drugs to Adam Garza's house in Galveston County, Texas." Complaint, ECF No. 1, at ¶ 12. It also alleges Kendal Garza used these Coeytaux-provided drugs to kill Mr. Rodriguez's unborn child after Adam Garza pressured her into aborting. *Id.* at ¶ 13 ("On September 19, 2024, Kendal Garza used the drugs that Adam had purchased from Coeytaux to kill the unborn child that she conceived with Mr. Rodriguez."). These factual allegations must be assumed true on a motion to dismiss. *See Christopher*, 536 U.S. at 406. The complaint also attaches *evidence* showing that Adam Garza ordered the drugs from Coeytaux and paid him for the illegal shipment, even though evidence is not needed to support factual claims at this stage of the litigation. *See id* Complaint, ECF No. 1, at ¶ 11 & Ex. 1. Coeytaux's assertion that complaint's law-breaking accusations are "untethered to specific factual allegations"[24] is simply false.

24. *See* Mot. to Dismiss, ECF No. 15, at 25.

It is a crime for Coeytaux to ship abortion pills into Texas, and Coeytaux does not deny this. Coeytaux contends only that he failed to violate a few of the many criminal laws that the complaint accuses him of breaking. *See* Mot. to Dismiss, ECF No. 15, at 25 (denying that the allegations show that Coeytaux violated Texas's pre-*Roe* abortion statutes or its murder laws). But Coeytaux still committed a "wrongful" act by flouting the remaining criminal statutes described in the complaint[25]—and not even Coeytaux denies that his alleged actions violated *those* criminal laws.

Coeytaux is wrong to deny that he committed murder by assisting Kendal Garza's self-managed abortion. Coeytaux misrepresents section 19.06(1) of the Texas Penal Code, which says that the criminal-homicide chapter "does not apply to the death of an unborn child *if the conduct charged is* (1) conduct committed by the mother of the unborn child." Tex. Penal Code § 19.06 (emphasis added) (italicized language omitted from Coeytaux's brief). This shields Kendal Garza from being "charged" with any type of homicide offense for the "conduct" that *she* "committed" with regard to the abortion. But it does not exempt self-managed abortions from the definition of murder, and it does not protect those who aid or abet self-managed abortions from prosecution. Texas's accomplice-liability statute makes clear that those who aid or abet self-managed abortions are guilty of murder, even though the pregnant woman who aborts remains immune from prosecution and is legally incapable of committing a criminal homicide offense. *See* Tex. Penal Code § 7.03 ("In a prosecution in which an actor's criminal responsibility is based on the conduct of another, the actor may be convicted on proof of commission of the offense and that he was a party to its commission, and it is no defense: (1) that the actor belongs to a

25. *See* Complaint, ECF No. 1, at ¶¶ 18–20; *id.* at ¶ 26.

class of persons that by definition of the offense is legally incapable of committing the offense in an individual capacity; or (2) that the person for whose conduct the actor is criminally responsible . . . is immune from prosecution.”).

Coeytaux is equally wrong to deny that he violated Texas’s pre–*Roe v. Wade* abortion ban. He correctly observes that *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004), held that the Texas pre-*Roe* abortion statutes were “repealed by implication.” *Id.* at 849. But section 2 of the Texas Heartbeat Act overruled *McCorvey*. *See* Tex. S.B. 8 § 2, 87th Leg., R.S. (2021) (“Texas never repealed, either expressly or by implication, the state statutes enacted before . . . *Roe v. Wade* . . . that prohibit and criminalize abortion”). The Heartbeat Act also amends the Code Construction Act, which now provides that: “A statute that regulates or prohibits abortion may not be construed to repeal any other statute that regulates or prohibits abortion, either wholly or partly, unless the repealing statute explicitly states that it is repealing the other statute.” Tex. Gov’t Code § 311.036(a). Each of these statutory provisions repudiates *McCorvey*’s holding that Texas’s post-*Roe* abortion regulations are somehow incompatible with the pre-*Roe* abortion ban. *See* Ken Paxton, *Updated Advisory on Texas Law Upon Reversal of Roe v. Wade* (July 27, 2022), available at http://bit.ly/3X1uOme [https://perma.cc/E93T-6GT3] (“[L]ocal prosecutors may choose to immediately pursue criminal prosecutions based on violations of Texas abortion prohibitions predating *Roe* that were never repealed by the Texas Legislature.” (footnotes omitted)).

### 2. The Alleged Violations Of State And Federal Criminal Statutes Qualify As “Wrongful” Acts Under Section 71.002(b)

Coeytaux seems to believe that Mr. Rodriguez has brought a common-law action against him for negligence per se, as he insists that the plaintiffs must show that the

alleged statutory violations would support a common-law action for negligence under the five-part test established in *Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998). *See* Mot. to Dismiss, ECF No. 15, at 25–31. But Mr. Rodriguez is asserting a *statutory* cause of action under Texas's wrongful-death statute, which imposes liability on Coeytaux if he caused the death of the unborn child by his "wrongful act, neglect, carelessness, unskillfulness, or default." Tex. Civ. Prac. & Rem. Code § 71.002(b). The question to resolve is not whether Coeytaux's alleged crimes would allow Mr. Rodriguez to pursue a negligence per se claim under *Perry*, but whether violations of the state and federal laws described in the complaint qualify as "wrongful acts" within the meaning of section 71.002(b).

It is inconceivable that violations of Texas's murder laws would fail to qualify as "wrongful" acts that trigger liability under the state's wrongful-death statute. It is equally inconceivable that violations of criminal statutes would fall outside the scope of "wrongful" acts encompassed by section 71.002(b). "Wrongful" has a broader scope than "criminal"; it is a term that encompasses all criminal acts while reaching further to sweep in conduct that is non-criminal but nonetheless "wrongful" (such as mere negligence). Coeytaux does not explain how a criminal act can fall outside the meaning of "wrongful," and he cites no authority from any Texas court that excludes criminal acts from the scope of section 71.002(b). It is astounding to think that section 71.002 would impose wrongful-death liability on a physician who accidentally kills a fetus through an act of medical malpractice,[26] while simultaneously

26. *See Windrum v. Kareh*, 581 S.W.3d 761 (Tex. 2019) (allowing wrongful-death lawsuit in response to medical malpractice to proceed under section 71.002(b)).

exempting someone who intentionally kills an unborn child by violating the state's criminal abortion laws.

Coeytaux is also wrong to accuse Mr. Rodriguez of reading an implied cause of action into the Comstock Act. *See* Mot. to Dismiss, ECF No. 15, at 30 (citing *Cort v. Ash*, 422 U.S. 66, 77–80 (1975)). The cause of action that Mr. Rodriguez is asserting rests entirely on section 71.002(b), which authorizes lawsuits against those who "cause" the death of an individual by a "wrongful act." Including Comstock violations within the definition of "wrongful act" will not "effectively allow private parties to enforce the Comstock Act,"[27] as Coeytaux claims, because no lawsuits to enforce Comstock could be brought in states where abortion remains legal, nor could any claim be brought unless the Comstock violation "causes" a death that occurs in Texas. The mere violation of Comstock does not give rise to liability. Only Comstock violations that *also* violate section 71.002(b) will trigger lawsuits for wrongful death.

## III. Ms. Rodriguez Has Alleged A Claim For Relief Under HB 7

Coeytaux seeks dismissal of Ms. Rodriguez's HB 7 claims on four different grounds, but none of his arguments warrant dismissal.

### A. Ms. Rodriguez Is Not Acting "In Concert Or Participation" With Mr. Rodriguez

HB 7 prevents Ms. Rodriguez from suing as a qui tam relator if she "acts in concert or participation" with Mr. Rodriguez, who was previously convicted of an "offense for which an affirmative finding of family violence was made." Tex. Health &

27. *See* Mot. to Dismiss, ECF No. 15, at 30.

Safety Code § 171A.101(d)(3)(B), (E).[28] Coeytaux accuses Ms. Rodriguez of acting "in concert or participation" with Mr. Rodriguez, but he bases this claim on nothing except the fact that she is his daughter. *See* Mot. to Dismiss, ECF No. 15, at 32. That does not prove that she is acting "in concert or participation" with Mr. Rodriguez. Family members are not presumed to act "in concert or participation" with their relatives, and injunctions do not bind family members based on a presumption that they act in "concert or participation" with the enjoined party. *See* Fed. R. Civ. P. 65(d)(2)(C) (providing that injunctions bind: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).").

More importantly, whether Ms. Rodriguez is acting "in concert or participation" with Mr. Rodriguez is a factual question, and courts cannot resolve factual disputes at the motion-to-dismiss stage. Instead, courts must construe the alleged facts in the manner most favorable to the party opposing dismissal. *See Christopher*, 536 U.S. at 406. Nothing in the complaint admits that Ms. Rodriguez is acting "in concert or participation" with Mr. Rodriguez, and a court cannot draw this inference when it must construe the factual allegations in favor of plaintiffs.

### B. Ms. Rodriguez's Factual Allegations Are Neither Vague Nor Conclusory, And Detailed Factual Allegations Are Not Required

Coeytaux once again insists that the plaintiffs plead their claims with a level of factual detail that the Rules of Civil Procedure simply do not require. *See Twombly*, 550 U.S. at 555 ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does

28. The complaint does not acknowledge Mr. Rodriguez's criminal history, but we do not quarrel with Coeytaux's request to take judicial notice of Mr. Rodriguez's court records. *See* Mot. to Dismiss, ECF No. 15, at 31 n.6.

not need detailed factual allegations"); *Iqbal*, 556 U.S. at 678 ("Rule 8 . . . does not require 'detailed factual allegations'" (citation omitted)). We have already refuted Coeytaux's *Twombly/Iqbal* objections in the Article III standing discussion. *See* pp. 6–9, *supra*. It is also untenable for Coeytaux to accuse Ms. Rodriguez of "fish[ing] for evidence"[29] when the complaint attaches evidence showing that Coeytaux is mailing abortion pills into Texas.

### C. Qui Tam Statutes Comport With The Texas Constitution

Coeytaux claims that qui tam statutes violate the Texas Constitution by divesting state officials "of their exclusive authority to enforce and litigate the state's rights." Mot. to Dismiss, ECF No. 15, at 33. This argument is meritless. Texas does not follow the holding of *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992),[30] and it has long been established that the Texas legislature may authorize not only qui tam relator actions but also citizen suits by individuals who have suffered no harm of their own. *See Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597 (1915) (allowing private litigants to sue under a statute that conferred standing upon "any citizen" to bring an action to enjoin the operation of a bawdyhouse, without any need to show individualized injury); *Scott v. Board of Adjustment*, 405 S.W.2d 55, 57 (Tex. 1966) (citing *Spence* with approval); *Grossman v. Wolfe*, 578 S.W.3d 250 (Tex. App.—Austin 2019, pet. denied) (upholding and enforcing citizen-suit provision in Tex. Nat. Res. Code § 191.173(a)). The Save Chick-fil-A law that the legislature enacted in 2019, for ex-

29. Mot. to Dismiss, ECF No. 15, at 33.

30. *See Andrade v. Venable*, 372 S.W.3d 134, 137 (Tex. 2012) ("*Unless standing is conferred by statute*, a plaintiff must show that he has suffered a particularized injury distinct from the general public." (emphasis added)).

ample, allows any "person who alleges a violation" of the statute to sue for declaratory and injunctive relief, plus costs and attorneys' fees—regardless of whether the plaintiff suffered injury in fact. *See* Tex. Gov't Code § 2400.004. The qui tam provisions in the Texas Medicaid Fraud Prevention Act also empower private citizens to sue lawbreakers on the government's behalf. *See In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018) ("[T]he Texas Medicaid Fraud Prevention Act . . . via *qui tam* provisions . . . deputizes private citizens to pursue a TMFPA action on the government's behalf."). Qui tam lawsuits to enforce the Texas Medicaid Fraud Prevention Act are ubiquitous, and Texas courts have entertained these lawsuits for decades without any Texas court ever holding that qui tam violates the Texas Constitution.

### D. HB 7 Does Not Violate The Supreme Court's Dormant Commerce Clause Doctrine

HB 7 prevents qui tam relators from suing Texas-licensed physicians and hospitals, and Coeytaux claims that this "discriminates" against "out-of-state physicians and hospitals" in violation of the dormant commerce clause. *See* Mot. to Dismiss, ECF No. 15, at 36–38. But it remains illegal for Texas-licensed physicians and hospitals to engage in any the behaviors prohibited by HB 7, as these entities must comply with the state's criminal abortion bans and restrictions on the provision of abortion-inducing drugs. *See* Complaint, ECF No. 1, at ¶¶ 18–28 (listing statutes). The law of Texas bans *everyone*—both inside and outside the state—from providing abortion pills within the state for the purpose of assisting an elective abortion.

Texas-licensed physicians and hospitals are exempt from HB 7 because the state can easily enforce its criminal abortion laws against these in-state entities, and the state's licensing authorities will quickly yank the license of any physician or hospital that flouts the state's abortion restrictions. There has also been universal compliance

with the state's abortion laws among the state's licensed medical providers, so there is no need to subject these in-state providers to qui tam lawsuits under HB 7.

The state is unable, however, to enforce its criminal abortion laws against out-of-state providers who mail abortion pills into Texas while hiding behind their home state's shield law. California will not extradite Coeytaux to Texas, and its shield law prohibits its courts from enforcing state-court orders or judgments that Texas officials might obtain against those who defy Texas abortion restrictions.[31] The conventional enforcement mechanisms that keep Texas-licensed medical providers in line are useless when it comes to out-of-state providers in shield-law states. HB 7's qui tam regime was enacted to enable private citizens to go after the lawbreakers that Texas cannot reach through the ordinary enforcement of its laws. This does not "discriminate" against "out of state physicians and hospitals," as Texas-licensed medical providers remain subject to Texas's abortion restrictions and cannot lawfully engage in any of the conduct proscribed by HB 7. It merely establishes a supplemental enforcement mechanism for the subset of providers who have evaded accountability for their illegal acts with help from their home state's shield law.

In all events, if this Court determines that the statutory carveout for Texas-licensed physicians and hospitals violates the dormant commerce clause, it should not "str[ike] down"[32] HB 7 or dismiss the qui tam claim. It should instead declare the statutory carveout unconstitutional, which is severable from the remainder of the

31. The penal-judgment exception to full faith and credit allows shield-law states to deny recognition to these judgments. *See Nelson v. George,* 399 U.S. 224, 229 (1970) ("[T]he Full Faith and Credit Clause does not require that sister States enforce a foreign penal judgment.").

32. Mot. to Dismiss, ECF No. 15, at 38.

statute. *See* Tex. Gov't Code § 311.032; Tex. H.B. 7 § 4, 89th Leg., C.S. (2025); *Virginia v. Hicks*, 539 U.S. 113, 121 (2003) ("Severab[ility] is of course a matter of state law."); *see also Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 508 (2010) ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." (citation and internal quotation marks omitted)); *id.* ("[T]he normal rule is that partial, rather than facial, invalidation is the required course" (citation and internal quotation marks omitted)).

## IV. The Plaintiffs Have Alleged A Claim For An Anti-Clawback Injunction

Coeytaux claims that the plaintiffs cannot obtain an anti-clawback injunction unless this Court denies the pending motion to dismiss the HB 7 claim. *See* Mot. to Dismiss, ECF No. 15, at 38–39. That is untrue, as the text of section 171A.151 makes clear that the plaintiffs are entitled to an antisuit injunction *regardless* of whether they ultimately prevail on the underlying HB 7 claim. Section 171A.151(c) says:

> Notwithstanding any other law, *in an action described by Subsection (a)(1) or (2)*, the court shall, on request, issue a temporary, preliminary, or permanent injunction that restrains each defendant in the action, each person in privity with the defendant, and each person with whom the defendant is in active concert or participation from:
>
> (1) bringing an action under any clawback provision against a claimant or prosecutor, a person in privity with the claimant or prosecutor, or a person providing legal representation or any type of assistance to the claimant or prosecutor . . .

Tex. Health & Safety Code § 171A.151(c) (emphasis added). Subsections (a)(1) and (a)(2) of section 171A.151, in turn, refer to:

> (1) bringing or engaging in an action authorized by this chapter, including Subsection (f); [and]

> (2) bringing or engaging in an action that alleges a violation of Section 171A.051.

Tex. Health & Safety Code § 171A.151(a). None of this requires the plaintiffs to bring a *successful* HB 7 claim as a prerequisite for obtaining an anti-clawback injunction. Section 171A.151(a)(2) shows that the plaintiffs need only to *allege* a violation of Section 171A.051 to bring this action within the scope of section 171A.151(c). And section 171A.151(a)(1) shows that the plaintiffs need only to "bring" or "engage in" a qui tam action described in section 171A.101; they do not need to *succeed* on that action to invoke the protections of section 171A.151(c). An unsuccessful qui tam action is still "authorized" by HB 7 even if it is ultimately dismissed as unmeritorious.

## CONCLUSION

The defendant's motion to dismiss should be denied.

Respectfully submitted.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Attorney-in-Charge*
Texas Bar No. 24075463
S.D. Tex. Bar No. 1133287
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: October 15, 2026

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 15, 2026, I served this document through CM/ECF upon:


Christopher M. Odell
Leah Schultz
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street, Suite 4000
Houston, Texas 77002-2755
(713) 576-2400 (phone)
(713) 576-2499 (fax)
christopher.odell@arnoldporter.com
leah.schultz@arnoldporter.com

Marc Hearron
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, New York 10038
(917) 637-3600 (phone)
(917) 637-3666 (fax)
mhearron@reprorights.org

Jenna Hudson
Center for Reproductive Rights
1600 K Street NW
Washington, DC 20002
(202) 628-0286 (phone)
jhudson@reprorights.org


/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiffs*